**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

ANTHONY BROWN,                )
                  Plaintiff    )        **C.A. 11-140 Erie**
                               )
       v.                      )
                               )        **Magistrate Judge Baxter**
ROBERT MAXA, et al.,           )
                  Defendants.  )

**OPINION AND ORDER**[1]

United States Magistrate Judge Susan Paradise Baxter.

## I.      INTRODUCTION

### A.      Relevant Procedural History

On June 30, 2011, Plaintiff Anthony Brown, a prisoner incarcerated at the State Correctional Institution at Forest in Marienville, Pennsylvania ("SCI-Forest"), filed a civil rights complaint pursuant to 42 U.S.C. § 1983, against Defendants Robert Maxa, medical director at SCI-Forest ("Maxa"), and Rhonda Sherbine, a physician's assistant at SCI-Forest ("Sherbine"). [ECF No. 1].

In his Complaint, Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment rights.[2] As relief for his claims, Plaintiff seeks compensatory and punitive damages.

---

[1]

The parties have consented to having a United States Magistrate Judge exercise jurisdiction over this matter. [ECF Nos. 7, 8).

[2]

Plaintiff also raised state law medical malpractice claims against Defendants; however, those claims have since been voluntarily dismissed by Plaintiff. (See ECF No. 16 and Text Order dated January 31, 2012).

The parties have completed discovery and Defendants have now filed a motion for summary judgment [ECF No. 28], asserting that Plaintiff has failed to properly exhaust his administrative remedies and has otherwise failed to produce any evidence to support his deliberate indifference claim. Plaintiff since filed a brief in opposition to Defendants' motion. [ECF No. 32]. This matter is now ripe for consideration.

### B.    Relevant Factual History[3]

On or about July 14, 2009, while incarcerated at SCI-Forest, Plaintiff saw a spider fall out of his sheets as he was making his bed. (ECF No. 33, Plaintiff's Statement of Material Facts, at ¶¶ 81, 82). That evening Plaintiff "felt weird" and noticed two red dots on his right leg. (Id. at ¶ 84). The next day he noticed swelling, put in a sick call slip, and went to the medical department, but was not seen. (Id. at ¶ 85). On July 17, 2009, Plaintiff was seen by Defendant Sherbine, a physician's assistant, who noted that Plaintiff had a spider bite on his lower right leg, and that the area was red and erythematous, with no drainage. Her assessment was an abscess of the right lower leg. (ECF No. 30, Defendant's Concise Statement of Undisputed Material Facts, at ¶ 3). To treat the abscess, Defendant Sherbine prescribed Doxycycline for ten days, Motrin three times a day for three days, and Bactrim two times a day for four days. (Id. at ¶ 4).

Defendant Sherbine saw Plaintiff again on July 20, 2009, and assessed him with an abscess to the right lower leg – improved. (Id. at ¶ 5). Plaintiff was next seen on August 18, 2009, by Nurse Practitioner O'Rourke ("O'Rourke"), at which time Plaintiff reported that the abscess on his right leg was not healing and seemed to be getting bigger. O'Rourke noted that the abscess was on Plaintiff's anterior calf and measured 5 mm deep by 1 cm, with no discharge.

---

3

The factual history herein is gleaned from the undisputed material facts of record, as set forth by the parties in Defendants' Concise Statement of Undisputed Material Facts and Plaintiff's response in opposition thereto [ECF Nos. 30, 33].

(Id. at ¶ 6). To treat the abscess, O'Rourke ordered dressing changes to the right lower leg, including Aquacel with a 2 x 2 band aid, which was approved by Defendant Maxa. (Id. at ¶ 7). Plaintiff's medical records reflect that he began receiving daily dressing changes by SCI-Forest's nursing staff on August 20, 2009, and Plaintiff has acknowledged that Defendant Sherbine was present during those changes. (Id. at ¶¶ 9-10).

On August 30, 2009, Defendant Maxa ordered wet to dry dressing changes to the wound until healed and prescribed Tylenol as needed for pain for seven days. (Id. at ¶ 13). On September 11, 2009, Plaintiff complained of pain around the wound area, and the nurse noted that the wound was 3 mm in depth with red/pink tissue. (Id. at ¶ 14). Plaintiff was subsequently seen by Defendant Sherbine on September 14, 2009, who noted that the wound measured 1.8 x 1.8 cm with smaller areas noted below the wound. (Id. at ¶ 15). On September 21, 2009, nurses noted that the new tissue around the wound was bright red, that the right foot and ankle were swollen, and that Plaintiff reported a moderate amount of pain to the area, with difficulty walking. (Id. at ¶ 16). On the same date, Plaintiff was seen by O'Rourke, who noted that Plaintiff had a clover leaf appearing ulcer on the anterior calf with swelling from the ankle to the bottom of the ulcer. (Id. at ¶ 17). As a result, orders were issued for Doxycycline 100 mg two times a day for ten days, an x-ray of the right lower leg to rule out osteomyelitis, and Bactrim DS two times a day for ten days. (Id. at ¶ 18).

On September 23, 2009, Defendant Maxa approved a consult with Dr. Simon, an outside specialist. (Id. at ¶ 20). On September 25, 2009, O'Rourke authored a note indicating that the bottom of the ulcer was closing and granulated tissue was appearing in a larger area, and that Plaintiff was seen by Defendant Maxa, who ordered dressing changes to the right leg with Aquacel and Duoderm, and Vicodin for fourteen days. (Id. at ¶ 22).  On October 9, 2009, Plaintiff was seen by O'Rourke, who noted that the wound was 3 cm x 2 cm open area with 5 mm depth, and had increased odor and drainage. She consulted with Defendant Maxa, who recommended discontinuing the Duoderm, and continuing dressing changes with Aquacel, along

with Vicodin for twelve days. (Id. at ¶ 23).

On October 20, 2009, Plaintiff was transported to Kane Hospital to see Dr. Simon, who ordered an x-ray and cultures, and noted that he would like Plaintiff to be seen by the wound care clinic. (Id. at ¶ 27). On October 21, 2009, Defendant Maxa extended the prescription of Vicodin, as needed for pain, through October 31, 2009. (Id. at ¶ 29). On October 27, 2009, Defendant Sherbine noted that Dr. Simon recommended treatment for an infection and Plaintiff was started on Cipro, 500 mg two times a day for 14 days. (Id. at ¶ 31). The culture results ordered by Dr. Simon were subsequently received by SCI-Forest's medical staff on October 28, 2009, at which time Defendant Maxa approved a consultation for Plaintiff with the Wound Clinic at Warren General Hospital (Id. at ¶¶ 32-33).

On October 29, 2009, Plaintiff was seen by Defendant Sherbine, who noted that the wound was non-healing, open, and dark red, with granulation tissue in the center, and that Vicodin was continued through November 2, 2009. (Id. at ¶ 34). Defendant Sherbine also issued orders for Plaintiff to shower in the infirmary daily for four weeks, to undergo dressing changes every three days after shower with Aquacel and Duoderm, and to follow up with the nurse practitioner or physician's assistant every week at dressing changes. (Id.).

On November 2, 2009, Plaintiff was transported to the Wound Clinic at Warren General Hospital and was seen by Dr. Susz, who examined the wound and provided a differential diagnosis of a spider bite, pyoderma gangrenosum, malignancy, and self-inflicted wound. Dr. Susz recommended wound dressings with Silvercel and Lyofoam. (Id. at ¶ 38). On November 3, 2009, Defendant Sherbine received the orders from the wound clinic, the nursing staff was informed of the care of the wound, and Vicodin was continued three times a day for seven days. (Id. at ¶ 39). On November 4, 2009, orders were issued for Plaintiff to shower in the medical department daily for thirty days; nursing was to remove the dressing before each shower and document the condition of the dressing; Plaintiff was to cleanse the wound with Hibiclens in the shower and rinse it thoroughly each day; Plaintiff was to apply Silvercel on the wound with an

4

ABD and gauze after each shower; and Plaintiff was to be seen by the physician's assistant or nurse practitioner every week for evaluation of the wound. (Id. at ¶ 40).

On November 6, 2009, Defendant Sherbine noted that Plaintiff was to continue on his treatment program prescribed by the wound clinic. (Id. at ¶ 41). Plaintiff was seen by Defendant Sherbine on November 12, 2009, at which time it was noted that Plaintiff's note was "significantly improved" with good granulation tissue and no infection. She assessed a healing wound and prescribed Vicodin before dressing changes only and Motrin 600 mg three times a day for 30 days as needed for pain. (Id. at ¶ 43). On November 16, 2009, Defendant Maxa approved a follow-up appointment with Dr. Susz, and issued orders for an Ace bandage over the wound dressing from the ankle to the knee, which was to be applied in the morning and taken off in the evening. (Id. at ¶ 44). Plaintiff was seen the following day by Defendant Sherbine, who noted that the wound was improving with good granulation tissue in the center and no infection of exudate. (Id at ¶ 45).

Plaintiff was transported to the Wound Clinic at Warren General Hospital on November 24, 2009, and was seen by Dr. Susz, who noted a U-shaped ulceration with some hypergranular tissue, but no redness, odor or signs of infection. Dr. Susz assessed right lower extremity ulceration with possible venous component, for which he recommended dressing changes every other day with Silvercel and Lyofoam or Allevyn foam. (Id. at ¶¶ 46-47). Plaintiff had a follow-up visit with Dr. Susz at the Wound Clinic on December 14, 2009, at which time Plaintiff rated his pain as a 2 on a 10 point scale. Dr. Susz noted there were no signs of soft tissue infection and minimal tenderness on palpation, and recommended that Plaintiff continue with the wound care and dressing changes. (Id. at ¶¶ 49-50).

On December 18, 2009, Defendant Maxa ordered a follow-up consultation with Dr. Susz, as well as new treatment for the wound, including Adaptic, Silvercel, Lyofoam, and dressing changes with an ace wrap. (Id. at ¶ 52). On December 24, 2009, orders were issued for Vicodin to be administered prior to dressing changes for 30 days. (Id. at ¶ 53). On January 4, 2010,

Plaintiff followed up with Dr. Susz, who noted Plaintiff's pain level was 2 out of 10, and his wound was smaller at 25mm x 33 mm x 3 mm deep, with pink and healthy peri wound tissue, and no signs of infection. (Id. at ¶¶ 54-55). Following Plaintiff's return to SCI-Forest, Defendant Maxa noted that Plaintiff was doing well and he issued orders to continue with dressing changes every other day and to cleanse the wound during shower with hibiscus, then apply Adaptic, Silvercel, Lyofoam, and an Ace bandage from toes to knee. (Id. at ¶ 56).

On January 22 and 30, 2010, orders were issued for Vicodin to be continued for successive periods of seven days prior to dressing changes. (Id. at ¶¶ 57-58). On February 3, 2010, Defendant Sherbine noted that Plaintiff's wound was healing and had good granulation tissue.  On February 11, 2010, orders were issued for Tylenol three times a day as needed for pain. (Id, at ¶ 60). Defendant Sherbine noted on April 6, 2010, that Plaintiff's wound was healing and that there was only a superficial wound remaining, and on April 10, 2010, she assessed that Plaintiff's wound was healed. (Id. at ¶¶ 61-62).

### C.    Standard of Review

Federal Rule of Civil Procedure 56(c)(2) provides that summary judgment shall be granted if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(e)(2) further provides that when a motion for summary judgment is made and supported, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party."

A district court may grant summary judgment for the defendant when the plaintiff has

failed to present any genuine issues of material fact. Fed.R.Civ.P. 56(c). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Andreoli v. Gates, 482 F.3d 641, 647 (3d Cir. 2007); UPMC Health System v. Metropolitan Life Ins. Co., 391 F.3d 497, 502 (3d Cir. 2004).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Fed.R.Civ.P. 56(e); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322. See also Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." Garcia v. Kimmell, 2010 WL 2089639, at * 1 (3d Cir. 2010) quoting Podobnik v. U.S. Postal Serv., 409 F.3d 584, 594 (3d Cir. 2005).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). The court must consider the evidence, and all

reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). See also El v. SEPTA, 479 F.3d 232, 238 (3d Cir. 2007).

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. Anderson, 477 U.S. at 248. Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Id. at 247-249.


**D.     Exhaustion of Administrative Remedies**

Defendants argue that Plaintiff's claims fail as a matter of law because Plaintiff has failed to comply with the exhaustion requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"), which provides:

> no action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prisons, or other correctional facility until such administrative remedies as are available are exhausted.

Id.

**1.     Exhaustion Requirement**

The requirement that an inmate exhaust administrative remedies applies to all inmate suits regarding prison life, including those that involve general circumstances as well as particular episodes.  Porter v. Nussle, 534 U.S. 516 (2002); Concepcion v. Morton, 306 F.3d 1347 (3d Cir. 2002) (for history of exhaustion requirement). Administrative exhaustion must be completed prior to the filing of an action. McCarthy v. Madigan, 503 U.S. 140, 144 (1992).

Federal courts are barred from hearing a claim if a plaintiff has failed to exhaust all the available remedies. Grimsley v. Rodriquez, 113 F.3d 1246 (Table), 1997 WL 2356136 (Unpublished Opinion) (10th Cir. May 8, 1997).[4]  The exhaustion requirement is not a technicality, rather it is federal law which federal district courts are required to follow. Nyhuis v. Reno, 204 F.3d 65, 73 (3d Cir. 2000) (by using language "no action shall be brought," Congress has "clearly required exhaustion").[5]

The PLRA also requires "proper exhaustion" meaning that a prisoner must complete the administrative review process in accordance with the applicable procedural rules of that grievance system. Woodford v. Ngo, 548 U.S. 81, 87-91 (2006) ("Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules ..."). Importantly, the exhaustion requirement may not be satisfied "by filing an untimely or otherwise procedurally defective ... appeal." Id. at 83; see also Spruill v. Gillis, 372 F.3d 218, 228-29 (3d Cir. 2004) (utilizing a procedural default analysis to reach the same conclusion) (" Based on our earlier discussion of the PLRA's legislative history, [...] Congress seems to have had three interrelated

---

[4]

Importantly, a plaintiff's failure to exhaust his administrative remedies does not deprive the district court of subject matter jurisdiction. Nyhuis v. Reno. 204 F.3d 65, 69 n.4 (3d Cir. 2000) ("...[W]e agree with the clear majority of courts that §1997e(a) is *not* a jurisdictional requirement, such that failure to comply with the section would deprive federal courts of subject matter jurisdiction.").

[5]

There is no "futility" exception to the administrative exhaustion requirement. Banks v. Roberts, 2007 WL 3096585, at * 1 (3d Cir.) citing Nyhuis, 204 F.3d at 71 ("[Plaintiff's] argument fails under this Court's bright line rule that 'completely precludes a futility exception to the PLRA's mandatory exhaustion requirement.'"). See also Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Indeed, as we held in *Booth*, a prisoner must now exhaust administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.").

objectives relevant to our inquiry here: (1) to return control of the inmate grievance process to prison administrators; (2) to encourage development of an administrative record, and perhaps settlements, within the inmate grievance process; and (3) to reduce the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits.").

<strong><u>2.      The Administrative Process Available to State Inmates</u></strong>

So then, no analysis of exhaustion may be made absent an understanding of the administrative process available to state inmates. "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  <u>Jones v. Bock</u>, 549 U.S. at 218.

The DC-ADM 804 grievance system, available to state prisoners, consists of three separate stages. First, the prisoner is required to timely submit a written grievance for review by the facility manager or the regional grievance coordinator within fifteen days of the incident, who responds in writing within ten business days. Second, the inmate must timely submit a written appeal to intermediate review within ten working days, and again the inmate receives a written response within ten working days. Finally, the inmate must submit a timely appeal to the Central Office Review Committee within fifteen working days, and the inmate will receive a final determination in writing within thirty days. <u>See</u> <u>Booth v. Churner</u>, 206 F.3d 289, 293 n.2 (3d Cir. 1997), <u>aff'd</u>. 532 U.S. 731 (2001).

10

3.      **Analysis**

Here, Plaintiff acknowledges that the only grievance he filed at SCI-Forest with regard to

treatment of the alleged spider bite on his right leg was grievance #281343, which he filed on

July 16, 2009. (ECF No. 3, Plaintiff's Statement of Material Facts, at ¶¶ 63, 68; ECF No. 36-3,

Plaintiff's deposition transcript, at p. 33 (internal p. 40)). This grievance reads as follows:

> I am filing this grievance because I was denied medical treatment on the 7-
> 14-09 I found a spider in my bed I filed [sic] out a sick call slip but on the
> 15th my leg swelled up I was in a lot of pain I couldn't wait on the sick call so
> I told the c/o that was working BB 2-10 pm shift on 7-16-09 about my spider
> bite on my right leg he gave me a pass to go down to medical I get down there
> and I tell the c/o at medical I got bitten by a spider and my right leg is numb,
> swollen and the pain moved up to my thigh and groin. The c/o told me the
> head nurse said to go back to my block. I explained to the c/o I'm in pain, but
> he came back and said the nurse working medical 2-10 pm shift on 7-16-09
> said it not a life or death situation go back to my block. I was denied medical
> treatment my leg not getting better it's getting worse the pain is spreading up
> my leg to my groin and my leg looks infected.  I was denied medical when I
> shouldn't have and I'm going to be taking up civil action on medical for
> negligence.

(ECF No. 30-9 at p. 2).

The principal focus of the foregoing grievance is Plaintiff's complaint that he was denied

medical treatment on July 16, 2009, by an unnamed nurse at SCI Forest's medical department.

This, however, does not encompass the claims in this case. Instead, Plaintiff's claims against

Defendants Maxa and Sherbine pertain to the alleged inadequacy of medical treatment that

occurred during the days and months following July 16, 2009.  In particular, Plaintiff claims that

Defendant Maxa was aware that Plaintiff's wound was worsening, yet, "without conducting in-

person examinations of [Plaintiff's] wound, he authorized a course of ineffective medical

11

treatment for several months." (ECF No. 1, Complaint, at ¶ 53). In addition, Plaintiff claims that

Defendant Maxa deliberately delayed Plaintiff's access to a medical specialist "who was qualified

to provide assessment and treatment of his serious medical condition," ostensibly for non-

medical reasons "such as paperwork and expense." (Id. at ¶¶ 55, 57). The primary claim against

Defendant Sherbine is that she allegedly refused to provide Plaintiff pain medication for some

unspecified period of time "because of her belief that prisoners abuse pain medication." (Id. at

¶ 59). In addition, Plaintiff claims that Defendant Sherbine "was aware that [his] wound was

worsening for several months," yet she "did not intervene to change the course of treatment." (Id.

at ¶ 54).

DC-ADM 804, § VI.A.7 requires an inmate to include in each grievance a statement of

facts relevant to his claim(s) and to "identify any person(s) who may have information that could

be helpful in resolving the grievance...."  Here, Plaintiff did not file any grievance challenging

the course of treatment provided by Defendants Maxa and Sherbine, as detailed in his complaint.

Moreover, neither Defendant was identified by name, description, or title in grievance #281343,

which is the only grievance Plaintiff filed that makes any reference to the treatment of the wound

at issue. Failure to name a Defendant at any time in the grievance procedure constitutes a

procedural default.  Spruill, 372 F.3d at 234. The requirement of naming a Defendant at the first

opportunity available during the grievance proceedings effectuates the goal of putting the prison

officials on notice of the persons claimed to be guilty of wrongdoing, as was explained by the

Third Circuit Court in Spruill: "[t]he purpose of the regulation here [i.e., regarding the initial

grievance] is to put the prison officials on notice of the persons claimed to be guilty of

wrongdoing."  Id.  Accord Williams v. Pennsylvania, Dept. of Corrections, 146 Fed. App'x 554, 557 (3d Cir.2005)( "[the prisoner's] failure to identify defendants in either of his two grievances, means that he failed to exhaust his administrative remedies in accordance with Pennsylvania's grievance process and the PLRA."); Mutschler v. Malena, 2012 WL 4057241, at *8 (W.D.Pa. Sept. 14, 2012)(same); Wishnefsky v Salameh, 2011 WL 338117, at *4 (W.D.Pa. Jan. 11, 2011)(same); Buehl v. Beard, 2007 WL 1830616 (W.D.Pa. June 25, 2007) (same).

Thus, it is clear from the record that Plaintiff has failed to properly exhaust his administrative remedies with regard to the claims at issue in this case. Furthermore, because the challenged events occurred over three years ago, Plaintiff has procedurally defaulted on his claims as well. As a result, summary judgment will be entered in favor of Defendants.[6]

An appropriate Order follows.

---

[6]

Because the Court has determined that Plaintiff has failed to exhaust his administrative remedies, there is no need to address Defendants' arguments challenging the merits of Plaintiff's claims.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTHONY BROWN,** | ) | |
| **Plaintiff** | ) | **C.A. No. 11-140 Erie** |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Baxter** |
| **ROBERT MAXA, et al.,** | ) | |
| **Defendants** | ) | |

<u>**ORDER**</u>

AND NOW, this <u>19th</u> day of March, 2013,

IT IS HEREBY ORDERED that Defendants' motion for summary judgment is GRANTED, and judgment is hereby entered in favor of Defendants against Plaintiff on all claims raised in the Complaint, due to Plaintiff's failure to exhaust his administrative remedies in accordance with the PLRA.

The Clerk is directed to mark this case closed.

/s Susan Paradise Baxter
SUSAN PARADISE BAXTER
United States Magistrate Judge

14